UNITED STATES of America,
Plaintiff–Appellee,

v.

Norman L. YOUNG, Clyde Edward Young, Jr., a/k/a Peanuts, Clyde E. Young, Sr., a/k/a Red, Lucious Levon Banks, a/k/a Junior Banks, David Young, Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia YOUNG, Defendant–Appellant.

Nos. 91–7126, 92–6316 and 92–6318.

United States Court of Appeals,
Eleventh Circuit.

Dec. 15, 1994.

John R. Howes, Ft. Lauderdale, FL, for Norman L. Young.

Al Pennington, Mobile, AL, for Nancy Preyer.

Richard G. Bartmon, Boca Raton, FL, for C. Young, Jr.

Arthur Madden, Mobile, AL, for Lucious Levon Banks.

Christopher A. Grillo, Ft. Lauderdale, FL, for David Young.

John R. Howes, Ft. Lauderdale, FL, for Clyde E. Young, Sr.

John R. Howes, John R. Howes, P.A., Ft. Lauderdale, FL, for Patricia Young in Nos. 92–6316 and 92–6318.

Charles A. Kandt, Asst. U.S. Atty., J.B. Sessions, III, U.S. Atty., Mobile, AL, for U.S. in all cases.

Before KRAVITCH and BIRCH, Circuit Judges, and HOEVELER *, Senior District Judge.

KRAVITCH, Circuit Judge:

This case involves a marijuana distribution business operated by an extended family, the Youngs, in a rural, secluded area of Southern Alabama. Members of the Young family, along with several confederates not related, were convicted for, *inter alia*, their participation in this conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846. Patricia Young, Clyde Young, Sr., Clyde Young, Jr., Norman Young, David Young and Lucious Levon ("Junior") Banks each now appeals his or her convictions on a variety of grounds. We REVERSE Junior Banks' conviction with respect to Count II of the indictment, and VACATE the sentence of Clyde Young, Jr. and REMAND for resentencing in light of this opinion. We AFFIRM the convictions and sentences of all remaining appellants.[1]

## I.

Clyde Young, Sr. began growing marijuana in 1982 on the area surrounding his property in Young's Neck, Alabama. Enlisting the assistance of his wife, Patricia, his sons, Clyde Jr., Thomas, Morris and Norman, his brother, David and his nephew, Milton, the business expanded in the years that followed. All family members at various times either

---

* Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Appellants raise several claims that do not warrant extensive discussion: Junior Banks, Clyde Young, Sr. and Norman Young contend that the trial court failed to give a requested jury charge on the testimony of a co-conspirator; Patricia Young, Clyde Young, Sr. and Norman Young claim that the court erred in not permitting them to present a defense of selective prosecution; Clyde Young, Sr. and Norman Young maintain that Lt. Sam Cochran was not qualified to testify regarding the drug notes found in a raid of the Young residence; and Patricia Young, Clyde Young, Sr., Clyde Young, Jr., Norman Young and David Young all contend that the evidence was insufficient to convict them for their participation in the drug conspiracy (Count II). Having thoroughly reviewed the record, we conclude that each of these claims is without merit. In addition, Clyde Young, Sr. contends the evidence was insufficient to convict him on Count X of the indictment, and both Clyde Young, Sr. and Norman Young claim the evidence was insufficient to convict either of them on Counts XIII, XIV and XV. Again, our review of the record reveals that the evidence was sufficient to convict each of these appellants for the offenses of which they were found guilty.

participated in or witnessed the growing, harvesting and sale of marijuana; often, some would tend the plants or assist customers while others kept watch over the road connecting the many Young relatives' houses.

In 1986, the Bureau of Alcohol, Tobacco and Firearms (ATF) conducted a search of the Youngs' property. During the course of the search, ATF agents stopped Patricia Young as she exited the back door of the house carrying a shoulder bag containing $11,079.00, a semi-automatic pistol, ten drug ledgers and a plastic bag with marijuana residue. Drug paraphernalia and more plastic bags with marijuana residue were also found inside the Young house. Following the ATF raid, Clyde Young, Sr. moved most of his family—and the marijuana business—to Earlville, Alabama, on the Mississippi border, while David Young continued to sell marijuana from Young's Neck. In 1988, police in Mobile County spotted Clyde Young, Jr. leaving one of two adjacent marijuana fields near the Youngs' Earlville property. In 1988, a search warrant was executed on this property, and in 1989, the Youngs were arrested.

## II.

■ Junior Banks challenges his conviction for conspiring with his co-defendants to distribute and to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846 (Count II). When a jury verdict is challenged on the ground of sufficiency of the evidence, the reviewing court must view the evidence in the light most favorable to the government and determine whether the jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Hernandez,* 896 F.2d 513, 517 (11th Cir.), *cert. denied,* 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990). In applying this standard all reasonable inferences and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it. *Id.* If there is a lack of evidence from which a reasonable fact-finder could find guilt be-

yond a reasonable doubt, the conviction must be reversed. *United States v. Awan,* 966 F.2d 1415, 1434 (11th Cir.1992).

■ The testimony of Stanley Commander, who had purchased marijuana from Banks on several occasions prior to becoming a government informant, constituted the bulk of the evidence on which the government relied in obtaining Banks' conviction. Specifically, Commander testified that the marijuana he had received from Banks had been supplied in ziploc bags; that in 1988, Banks told Commander that he planned to trade several horses for marijuana from someone in Mississippi; and that in 1987, Commander overheard Banks say that he was not dealing marijuana at that time because "the heat's on my man." In addition to Commander's testimony, the record shows that Banks offered to sell marijuana to Clyde Young, Sr. who, fearing that he was being "set up," refused to go through with the transaction; that one of the drug ledgers seized from Patricia Young included the marking "R–J," Junior's alleged nickname; and that Banks' telephone number appeared on a telephone note pad found at the Youngs' house.

The evidence described above, the sum total of the evidence presented at trial linking Banks to the conspiracy, was insufficient to sustain his conviction. In reaching this conclusion, we address each piece of evidence in turn: First, in view of the fact that a plastic "baggie" is hardly a unique container in which to place marijuana, the government's contention that the mere fact that both Banks and the Youngs sold marijuana in ziploc bags is probative of a conspiracy is thoroughly unavailing. Second, we reject the government's suggestion that because the Young family's property in Earlville, Alabama was located in an area near the Alabama/Mississippi border referred to as "Mississippi," Banks' reference to an imminent deal with a marijuana supplier in "Mississippi" necessarily referred to Clyde Young in Alabama. Particularly in light of the otherwise threadbare nature of the evidence against Banks, the inference that when

Banks said "Mississippi" he really meant "Alabama" is neither logical nor permissible. Third, with respect to the marijuana-for-horses transaction, Banks' wife, Georgia Banks, testified that she sold horses to a man accompanied by Clyde Young but that Banks himself was not aware of the sale. Even crediting the government's assertion that Junior Banks indeed participated in this transaction, no evidence was submitted showing that marijuana was exchanged for the horses or that this was part of an ongoing conspiracy between Banks and Clyde Young. Fourth, the sole evidence offered to show that Banks was personally acquainted with any of the Youngs was the testimony of Doug Burch, a former customer of Clyde Young, Sr., who recalled Young, Sr. telling him that Banks had offered to sell him "some" but that he had refused the sale because "he thought they were trying to set him up."[2] At most, this testimony revealed that Young and Banks were at one time associated in an incomplete drug transaction. It is axiomatic that mere association, without more, cannot give rise to a conspiracy conviction. *United States v. Jenkins*, 779 F.2d 606, 615–16 (11th Cir.1986).[3] Fifth, the government argues that Banks' statement that he was no longer selling marijuana because "the heat's on my man" referred to Clyde Young, Sr., who had recently been arrested. Bearing in mind the inconclusive nature of the other evidence proffered to connect Banks to this conspiracy, the reference to "my man"—a relatively common, colloquial expression—could have encompassed virtually any drug supplier.

Finally, this leaves as the sole remaining evidence connecting Banks to this conspiracy a drug ledger seized from Patricia Young's purse bearing the initials "R–J" on the top of one page. The government suggests that these letters clearly refer to "Junior," which is Banks' nickname. It is by no means self-evident that "R–J" is the shorthand equivalent of Junior, or that Junior Banks is the only plausible bearer of that particular nickname. However, viewing the evidence in the light most favorable to the government and thus assuming, arguendo, that the initials on the note pad indeed were those of Junior Banks, this evidence alone is not sufficient to link him to the wider conspiracy at issue in this case. There was no evidence that any of the Youngs acted as a supplier to Banks, nor was there evidence either that Banks had purchased marijuana from the Youngs or they from him. Again, to the limited extent that the record supports the proposition that Banks ever was acquainted with Clyde Young, Sr., this alone is not enough to support his conviction for conspiracy. Accordingly, his conviction on Count II of the indictment is REVERSED.

■■■ Banks. also contends that the language of Count IX of the indictment charging him with possession with intent to distribute was fatally at variance with the proof offered at trial. A variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same. *United States v. Church*, 955 F.2d 688 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992); *United States v. Keller*, 916 F.2d 628, 634 (11th Cir.1990), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). We will not reverse a conviction based on a variance, however, unless the variance was material and substantially prejudiced the defendant. *United States v. Reed*, 980 F.2d 1568, 1581 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993). *See also United States v. Figueroa*, 666 F.2d 1375, 1379 (11th Cir.1982); *Jenkins*, 779 F.2d at 617; *United States v. McCrary*, 699 F.2d 1308 (11th Cir.1983). Count IX charged Banks with possession with intent to distribute two

---

**2.** R3–692–693.

**3.** Similarly, the fact that the Youngs had a note pad containing the telephone number of Junior and Georgia Banks—along with forty-six other telephone numbers including that of a drug store and a paint store—indicates that the Bankses and the Youngs knew each other, a fact which simply does not give rise to a permissible factual finding of conspiracy.

pounds of marijuana on February 5, 1986, in violation of 21 U.S.C. § 841(a)(1). Banks suggests that the evidence presented at trial failed to demonstrate that he possessed marijuana on the date alleged in the indictment. A variance between the dates alleged and the dates proved at trial generally will not trigger reversal provided that the date proved falls within the statute of limitations and before the date of the indictment. *United States v. Alexander,* 850 F.2d 1500, 1505 (11th Cir.1988), *vacated,* 492 U.S. 915, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *reinstated on remand,* 888 F.2d 777 (11th Cir.), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 643 (1989). Because the evidence presented at trial adequately established that the offense charged in Count IX occurred within the five-year statute of limitations period, we affirm Banks' conviction on that count.

Stanley Commander, who provided the sole testimony with respect to the charge that Banks possessed marijuana on February 5, 1986, testified that he began dealing marijuana with Banks in late 1983 or early 1984 in quantities of approximately one or two pounds per week. This amount increased to approximately ten pounds per week from 1985 to 1988, when Commander was arrested. Commander further testified as follows:

Question: Going back to your arrest April 10th, 1985, when the search warrant found two ounces of marijuana in your residence, when did you get that?[4]

Answer: Probably about four days before that.

Question: And who did you get that from?

Answer: Junior.

Question: And how much did you get when you got marijuana from Junior Banks approximately four days before?

Answer: One to two pounds.

Question: Other than that April 10th date, do you remember any other specific dates that you got marijuana from him?

Answer: On February 5, my birthday?

Question: How do you remember—well, how does the fact that it's on your birthday refresh your memory?

Answer: My wife had me a birthday party and Junior pulled up and give me two pounds.[5]

Banks argues that this testimony fails to prove that he distributed marijuana on or near February 5, 1986. We decline to adopt Banks' interpretation of the aforementioned colloquy. Reading Commander's statement regarding the delivery of marijuana on his birthday in tandem with his statement regarding the April 1985 purchase of marijuana, it is only logical to assume that the birthday delivery occurred in chronological proximity to the April 1985 purchase; in other words, it is unlikely that Commander would have mentioned the two events in rapid sequence had they been separated by several years. To this end, it is highly improbable that the referenced birthday was in 1984. It is far more plausible that the birthday in question was either in 1985 or in the year immediately following 1985. More important, a jury could so find beyond a reasonable doubt. Even to the extent that the evidence presented at trial pointed more definitively to a birthday delivery in 1985 rather than 1986, as alleged in the indictment, this date was not only within the statute of limitations but in this case was reasonably and sufficiently close to the date approximated in the indictment. *See United States v. Champion,* 813 F.2d 1154, 1168 (11th Cir.1987) (prosecution's use of the "on or near" designation with respect to a date in the indictment cured possible one month variance between date alleged in indictment and date proved at trial); *United States v. Harrell,* 737 F.2d 971, 981 (11th Cir.) (variance between February date alleged in indictment and proof at trial that charged offense occurred "during the summer" held non-prejudicial), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985).

---

4. Banks was convicted of possession with intent to distribute marijuana on April 10, 1985 (Count III). He does not appeal this conviction.

5. R7–282–283.

By the same token, the requirement that the allegations in the indictment and the proof at trial correspond serves two purposes: it insures that the defendant is properly notified of the charges so that he may present a defense, and it protects the accused against the possibility of another prosecution for the same offense. *United States v. Alexander,* 850 F.2d at 1505. Here, there is no indication that the possible difference between the date set forth in the indictment and the date established at trial either undermined the appellant's right to proper notice of the charges or exposed him to the danger of a second prosecution for the same offense. *See id.* The record amply demonstrates that Banks and Commander had an ongoing business relationship from approximately late 1983 through 1988 in which Banks supplied Commander with several pounds of marijuana on a weekly basis. The indictment, in turn, charges Banks with an offense—possession with intent to distribute two pounds of marijuana—that is unequivocally encompassed by these weekly transactions. Banks therefore cannot claim to have been prejudiced by the element of surprise in hearing Commander's testimony regarding the birthday delivery; similarly, this testimony did not render Banks unable to mount a defense. We conclude that there was no impermissible variance between the facts alleged in Count IX of the indictment and the proof offered at trial.

### III.

Clyde Young, Jr. argues that the court abused its discretion in denying his motions for acquittal on both the charge of possession with intent to distribute marijuana on August 3, 1988 (Count XXII) and conspiracy to possess with intent to distribute marijuana (Count III). We affirm both convictions.

The record demonstrates that Clyde Young, Jr. participated in selling marijuana from his father's house, in accepting payment for each of these sales, and in weighing and bagging harvested marijuana. On August 3, 1988, the narcotics division of the Mobile County Sheriff's Department was conducting aerial surveillance in the area of the Young family's Earlville property when they spotted two marijuana fields and a man in an all-terrain vehicle driving away from one of the fields. The aircraft followed the man in the vehicle, later identified as Clyde Young, Jr., who drove through the woods to the house of Clyde Young, Sr. The police investigated the marijuana patches and found that the marijuana was planted in large coffee cans as was the marijuana on the Young's Neck property. The patches were accessible only from the properties of Clyde Young, Sr., Clyde Young, Jr. or Norman Young. Viewing the totality of this evidence in the light most favorable to the government and drawing all credibility choices in favor of the jury verdict, *see Hernandez,* 896 F.2d at 517, we conclude that the evidence was sufficient for a jury to find beyond a reasonable doubt that Clyde Young, Jr. both participated in the Young conspiracy and possessed marijuana, as part of this conspiracy, on August 3, 1988.

Clyde Young, Jr. also appeals the enhancement of his sentence by three levels based on the court's finding that he acted as a manager or supervisor of the drug conspiracy. A sentencing court's determination of a defendant's role in a crime is a finding of fact reviewed under the clearly erroneous standard. *United States v. Griffin,* 945 F.2d 378, 384 (11th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1958, 118 L.Ed.2d 561 (1992). Among the factors recognized by the Sentencing Guidelines as relevant in ascertaining whether the defendant played a managerial or supervisory role are whether the defendant exercised either decision-making authority or a degree of control over other members of the criminal enterprise. *See* U.S.S.G. § 3B1.1, comment. (n. 3) (Nov. 1989); *United States v. Jones,* 933 F.2d 1541, 1546–47 (11th Cir.1991) (defendant's sentence properly enhanced because he coordinated and managed delivery and transportation of marijuana from Jamaica into the United States); *United States v. Howard,* 923 F.2d 1500, 1503 (11th Cir.1991) ("defendant …

properly had sentence enhanced for managerial role because he acted as a source of credit and maintained at least constructive control over individual to whom he provided the drugs and collected payment"); *United States v. Griffin*, 945 F.2d at 385 ("'[Appellant] specifically directed the participation of [co–conspirator] and his roommate in their operation in the drug conspiracy.'").

▮ The record in this case does not support the trial court's finding that "based upon the trial testimony and the preponderance of the evidence," [6] Clyde Young, Jr. acted as a manager or supervisor of the Young conspiracy. As discussed above, testimony offered at trial adequately demonstrated that Clyde Young, Jr. was a knowledgeable participant in the criminal enterprise at issue. Young, Jr. was witnessed both tending marijuana plants and weighing and bagging harvested marijuana. There is nothing in the record, however, to indicate or prove by a preponderance of the evidence that he exercised any control or supervisory powers over the operation as a whole or over any of its individual members. The mere fact that Clyde Young, Jr. was the eldest son—information posited by the government as indicative of his managerial status—is neither dispositive nor relevant to our inquiry; we will not base our determination on a presumption that the oldest male is the natural heir to his father's business. To the contrary, we conclude that the trial court erred in enhancing Young, Jr.'s sentence based on his alleged role as a manager or supervisor. We therefore vacate the sentence imposed on Clyde Young, Jr. and remand for resentencing.

### IV.

▮ Clyde Young, Sr. and Norman Young contend that the judge who presided over these proceedings, Hon. Charles R. Butler, Jr., abused his discretion in failing to recuse himself *sua sponte* due to a conflict of interest. Appellants' claim is based on an alleged ongoing business relationship between Judge Butler and the Youngs' neighbor, Jay Altmeyer. In a separate context, during the course of the trial appellants attempted to introduce evidence tending to show that Altmeyer had an interest in acquiring their property which the district court did not permit. Appellants now aver that prior to Judge Butler's tenure on the bench, he was a partner in a law firm that had a stake in another parcel of real estate in which Altmeyer also had invested. Ownership to the property was contested at that time, and the parties filed a motion to quiet title. Judge Butler was lead counsel in that action. Any partnership or legal involvement with respect to the real estate venture terminated prior to the commencement of this trial.

28 U.S.C. § 455 states, in pertinent part, that "[a]ny justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned." The statute was adopted in conformity with the analogous canon in the Code of Judicial Conduct. In *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir.), [7] *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), our predecessor court had occasion to address and interpret the reach of the statute mandating recusal under circumstances in which a judge's impartiality reasonably might be questioned. In concluding that the judge in that case had erred in not recusing, the court noted that "the goal of the judicial disqualification statute is to foster the *appearance* of impartiality." *Id.* at 1101. In *Potashnick*, however, the association between the trial judge and appellant's counsel was extensive and continued, in part, throughout the duration of the trial. *See Potashnick*, 609 F.2d at 1111 (deciding that judge should have disqualified himself, court observed that judge had once been a partner in a law firm with appellant's counsel, with whom he had an

---

6. R2–58.

7. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as circuit precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ongoing friendship; that they had invested in real estate ventures together in the past; that appellant's counsel was involved in several real estate transactions during the trial that implicated the judge; and that the judge's father was a senior partner in the firm in which appellant's counsel was a partner).

Decisional law in this circuit following *Potashnick* consistently has held that failure to recuse constitutes reversible error only where the conflict of interest is readily apparent and the risk of impartiality is substantial. *See, e.g., Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994) ("Neither the district judge's delay, nor his adverse rulings, constitute the sort of 'pervasive bias' that necessitates recusal."); *United States v. Killough,* 848 F.2d 1523, 1529 (11th Cir.1988) ("Neither a trial judge's comments on lack of evidence, rulings adverse to a party, nor friction between court and counsel constitute pervasive bias."); *Hunt v. American Bank & Trust Co. of Baton Rouge,* 783 F.2d 1011, 1016 (11th Cir.1986) ("We do not believe that a law clerk's acceptance of future employment with a law firm would cause a reasonable person to doubt the judge's impartiality so long as the clerk refrains from participating in cases involving the firm in question."); *Huff v. Standard Life Ins. Co.,* 683 F.2d 1363, 1370 (11th Cir.1982) ("While it is true that the judge did associate with and was a partner of the firm prior to appointment to the bench, this does not create the same risk of impartiality found in *Potashnick*."). *Compare United States v. State of Alabama,* 828 F.2d 1532, 1544–46 (11th Cir.1987) ("During his tenure in the state legislature, the trial judge actively participated in the very events and shaped the very facts that are at issue in this suit ... [t]o permit [a judge] to decide a case in which he had extra-judicial, personal knowledge of disputed facts would be contrary to the express language and underlying spirit of the statute, as well as the case law."), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1523–24 (11th Cir.1988) (Where trial judge stated in footnote of memorandum his gratitude to law clerk for discussions concerning case; law clerk was son of partner in appellees' law firm; law clerk's father had also been law clerk to trial judge; and law clerk conducted hearing in judge's absence, court held that "these facts might cast doubt in the public's mind on [judge's] ability to remain impartial...."), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989).

The former business dealings between Judge Butler and a potential defense witness in this case simply do not rise to the level of manifest conflict of interest contemplated by this court in *Potashnick* or in the cases that followed. Not only had the business relationship ceased to exist prior to the commencement of this trial, but Altmeyer was not a witness in the case. Because there was neither a risk of impartiality nor even the appearance of impropriety on the part of Judge Butler, the fact that he did not recuse from these proceedings *sua sponte* did not constitute error.

## V.

David Young argues that he withdrew from the Young conspiracy prior to November 7, 1987, the effective date of the adoption of the Sentencing Guidelines, and that he therefore should not have been sentenced pursuant to the Guidelines' mandatory provisions. The Sentencing Guidelines are applicable not only to criminal offenses committed after the date the Guidelines went into effect, but also to conspiracies that began before and continued after the effective date. *See United States v. Pippin,* 903 F.2d 1478, 1481 (11th Cir.1990); *United States v. Terzado–Madruga,* 897 F.2d 1099, 1123 (11th Cir.1990). A conspirator may be able to escape sentencing under the Guidelines, however, if he can meet his burden of proving withdrawal from the conspiracy before November 1, 1987. *United States v. Nixon,* 918 F.2d 895, 906 (11th Cir.1990). The burden is on the defendant to prove affirmative withdrawal prior to November 1, 1987; the government need not prove that the defendant

committed any act in furtherance of the conspiracy after November 1, 1987, or even that the defendant knew that conspirators had acted after the deadline. *Id.*

This circuit recognizes that a conspirator's participation in a conspiracy is presumed to continue until all activity relating to the conspiracy is ceased. *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). A two-prong test exists to establish withdrawal from the conspiracy: first, the defendant must prove that he has taken affirmative steps to defeat the objectives of the conspiracy; and second, he must show either that he made a reasonable effort to communicate these acts to his co-conspirators or disclosed the scheme to law enforcement authorities. *United States v. LeQuire*, 943 F.2d 1554 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). David Young maintains that in the early part of 1987 he moved to Mississippi and initiated his own drug business entirely apart from that of his brother, Clyde Young, Sr., thereby evincing a clear withdrawal from the conspiracy. David Young appears to suggest that setting up a competing illegal enterprise, by itself, comprises effective withdrawal from a conspiracy, a position that we decline to adopt. The record shows that several members of this conspiracy may have, on occasion, transacted business separate from the overall operation. The fact that a conspirator to a drug-dealing scheme sometimes sells drugs "on the side" and purely for his own profit, however, is not inconsistent with participation in the conspiracy itself. More important, this does not constitute an effort to thwart the objectives of the conspiracy, as is required under the decisional law of this circuit. Moreover, even to the extent that he may have suspended his active involvement in the Young conspiracy, mere cessation of criminal activity is insufficient to demonstrate withdrawal. *See, e.g., United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir.1993) ("Since [appellant] merely ceased to participate and did not affirmatively withdraw, the defense of withdrawal is not available to him."); *United States v. Nixon*, 918 F.2d at 907 ("[A]ppellant's assertion that he refused ... to 'mule' drugs for the conspiracy is irrelevant if he continued to demand that he be paid for his prior illegal activity.").

Because David Young failed to sustain his burden of proving that he withdrew from the conspiracy before the enactment of the Sentencing Guidelines—or, for that matter, at any time thereafter prior to the return of the indictment—we conclude that he was properly sentenced under the Sentencing Guidelines.

In addition, David Young, Clyde Young, Jr., Clyde Young, Sr., Norman Young and Junior Banks argue that the district court abused its discretion in admitting into evidence the spiral notebooks seized from Patricia Young on January 29, 1986 and containing records of the Youngs' drug transactions. These appellants contend that the notebooks constituted hearsay. Declarations by one defendant, however, may also be admissible against other defendants as non-hearsay upon sufficient showing that the statement was made by a co-conspirator during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). *See Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). Here, the notebooks documented an ongoing series of transactions integral to this conspiracy, and therefore were admissible against each defendant provided that he or she was found to be a co-conspirator. Having held that the evidence was sufficient to convict David Young for participation in the Young conspiracy, we further resolve that the district court did not abuse its discretion in permitting the introduction of the drug ledgers into evidence as statements of a co-conspirator in furtherance of a conspiracy.

### VI.

David Young, Clyde Young, Jr., Clyde Young, Sr. and Norman Young each challenge the district court's calculation of

their respective offense levels at sentencing based on a finding that the conspiracy distributed more than one thousand kilograms of marijuana. A district court's finding as to the quantity of drugs involved in a conspiracy will not be set aside unless clearly erroneous. *United States v. Robinson*, 935 F.2d 201, 205 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992).

 The Guidelines in effect at the time of sentencing in this case stated:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

*See* U.S.S.G. § 1B1.3, comment. (n. 1) (Nov. 1989). At the sentencing hearing of David Young, Norman Young and Clyde Young, Jr., the court explicitly adopted its findings pursuant to its earlier sentencing of Clyde Young, Sr. During that earlier proceeding, the court had explicitly found by a preponderance of the evidence that there was "at least a thousand kilograms of marijuana dealt with and that was supported by trial testimony and those drug records." [8] As discussed above, the referenced drug records detailed the sale of approximately 130 kilograms of marijuana to several customers conducted over roughly a two month period. Appellants contend that the court improperly extrapolated the amount of drugs sold over the course of two months, as reflected in the ledgers, and projected this figure over the four-year duration of the conspiracy to arrive at a total drug quantity. Appellants suggest that business was uneven during the years in which they sold marijuana, and that the period accounted for in the records cannot be presumed to be representative of the conspiracy as a whole.

The record, however, adequately supports the trial court's findings as to drug quantity.

Testimony by several government witnesses established that the Youngs' drug business was continuous over a span of four years, and that the volume of sales remained consistent and substantial during this time. The drug ledgers further confirm a steady, unremitting stream of sales. Although the evidence suggests that the amount of drugs sold during the two-month period reflected in the seized ledgers was not unusual relative to the quantity sold over the course of the conspiracy, the court did not base its calculation on a presumption that the Youngs sold 130 kilograms every two months for four years; had it done so, the conspirators would have been sentenced on the basis of having distributed over three thousand—rather than one thousand—kilograms of marijuana. Moreover, in view of our conclusion that the evidence was sufficient to convict both David Young and Clyde Young, Jr. for their participation in the conspiracy throughout its entire course, we also hold that the trial court was not clearly erroneous in finding that the quantity attributable to the conspiracy as a whole was attributable to these defendants. *See United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993) ("Once the extent of a defendant's participation in the conspiracy is established, the court can determine the drug quantities reasonably foreseeable in connection with that level of participation."). The court's estimation of drug quantity was reasonable and will not be disturbed.

### VII.

 At the separate trial of Patricia Young, in response to an inquiry by the government concerning safety precautions employed by the Youngs to prevent discovery of the marijuana conspiracy by law enforcement personnel, Milton Young testified that the Youngs were also involved in the illegal production of alcohol. Patricia Young argues that this solely constituted evidence of prior bad acts, and that its admission

---

8. R14–1968.

therefore was an abuse of the trial court's discretion.[9] We agree.

Fed.R.Evid. 404(b) permits the admission of prior bad acts evidence to show, *inter alia,* motive, purpose, opportunity, intent, preparation, plan or knowledge. Following Milton Youngs' testimony regarding the Youngs' moonshine operation, the court instructed the jury that it was to consider this evidence exclusively for the purpose of showing intent, knowledge or motive. We fail to discern, however, the relevance of the family's use of an illegal still to the marijuana conspiracy at issue in this case. Although this circuit previously has held that evidence of a defendant's prior possession with intent to distribute a controlled substance may be, in certain circumstances, admissible to show possession with intent to distribute a different controlled substance, *see, e.g., United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1224 (11th Cir.1993) ("[E]vidence of [defendant's] arrest for possessing marijuana with intent to distribute was relevant to the issue of his intent to conspire to possess and distribute cocaine . . . [t]he intent elements of these two offenses were identical: possession with intent to distribute . . . ."), there is neither precedent nor valid reason to extend this doctrine to form an equivalence between the production of marijuana and the production of alcohol.[10] The two offenses are neither similar nor intertwined, as the government suggests. Alcohol is not a controlled substance, and the illegality of its production is distinct in both fact and law from that involved in growing and selling marijuana. Evidence that the Youngs made alcohol thus was not probative of their intent to engage in a conspiracy to possess and distribute marijuana, and any

inference that could be drawn from the introduction of this evidence was precisely that which Rule 404(b) was designed to prohibit.[11] We therefore conclude that the court improperly admitted testimony concerning the Youngs' moonshine production.

We further resolve, however, that this error is not reversible in that the appellant's substantial rights were not affected. *See United States v. Sonntag,* 684 F.2d 781, 788 (11th Cir.1982) ("error is not reversible unless it has prejudiced the substantial rights of the accused by 'substantially influencing' the jury."). Even setting aside the testimony of Milton Young regarding the Youngs' liquor production business, the evidence presented at trial was sufficient to convict Patricia Young. We therefore hold that the error committed by the district court in admitting evidence pertaining to the Youngs' moonshine production was not reversible.

## VIII.

For the foregoing reasons, the conviction of Junior Banks on Count II of the indictment is REVERSED. In addition, the sentence of Clyde Young, Jr. is VACATED and REMANDED for resentencing in light of this opinion. The convictions and sentences of Clyde Young, Sr., David Young, Patricia Young and Norman Young are AFFIRMED.

---

9. We note that Clyde Young, Jr., Clyde Young, Sr. and Norman Young adopt that portion of Patricia Young's appellate brief addressing the instant claim. Patricia Young, however, was tried in a separate proceeding two years after the other three defendants. Appellants do not explain how evidence submitted at a trial that occurred subsequent to their conviction could have been prejudicial to their rights; moreover, this court can divine no sound justification for such a claim. As a result, we decline to address this ground for appeal with respect to Clyde Young, Jr., Clyde Young, Sr. and Norman Young.

10. *See also United States v. Williford,* 764 F.2d 1493, 1498 (11th Cir.1985) (where court affirmed admission of evidence of prior cocaine dealing in marijuana conspiracy case, court held that "[w]hen intent is an issue . . . extrinsic evidence [*of other types of drug dealing* ] is admissible to show willingness to deal in drugs") (emphasis added).

11. Fed.R.Evid. 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."