[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11174
Non-Argument Calendar
_____

D.C. Docket No. 2:08-cr-00309-LSC-TMP-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAMAR GIBSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(January 31, 2017)

Before ED CARNES, Chief Judge, MARCUS and FAY, Circuit Judges.

PER CURIAM:

A jury convicted Lamar Gibson of conspiring to possess cocaine base ("crack cocaine") with intent to distribute, distributing crack cocaine, and attempting to distribute crack cocaine.  He contends (1) that he was improperly excluded from voir dire, (2) that the district court made several erroneous evidentiary rulings, (3) that the evidence presented at trial was not sufficient to support his attempt conviction, and (4) that the prosecution impermissibly shifted the burden of proof onto him during closing arguments.  He also contends that he is entitled to an evidentiary hearing on his motion for a new trial, which is still pending before the district court.

## I.

## A.

In August 2007, Jesse Henderson sold drugs to a confidential source working with the Drug Enforcement Administration and Bessemer Police Department.  He began cooperating with law enforcement, hoping that his future prison sentence would be reduced as a result.  Henderson identified Lamar Gibson and Sean Greer as participants in the drug trade.  He indicated that Greer was a middleman for Gibson, and that he could contact Greer.  Henderson would eventually participate in three drug-deals involving Gibson and testify about those transactions at Gibson's trial.

2

1.

The first was a controlled buy that occurred in February 2008. At the DEA's behest, Henderson reached out to Greer to set up a purchase of crack cocaine. He explained that he did not contact Gibson directly because Gibson and Greer were friends and Greer was "sort of like the middleman."

Henderson made several calls to Greer in January and early February of 2008, attempting to set up a deal with Gibson. At trial, the government played recordings of two calls from February 22. During the first call, Henderson asked Greer if he had spoken to Gibson. Greer responded that he had just spoken to Gibson and the deal was on. Henderson then asked if Gibson was going to sell him two ounces or two and a quarter ounces of crack cocaine. Greer said he would talk to Gibson and find out. Henderson informed Greer that he wanted two and a quarter ounces (or a "half big"). On the following call, they agreed on a price of $1,750 for the drugs. During both calls, the men also discussed a time and place for the deal.

Henderson testified that he eventually agreed to meet Greer later that day in front of Henderson's house. The DEA equipped Henderson with a body wire before the deal. Henderson waited in an SUV outside his home. He testified that he saw Greer and Gibson arrive and park in front of him in another car. Through the rear window of that car, he allegedly saw Gibson hand a package to Greer.

3

Greer then exited the car and entered Henderson's SUV, where they exchanged the money for the package, which contained crack cocaine.

Because the crack cocaine was brown instead of white, Henderson testified that he got out of his SUV and went to talk to Gibson. Gibson told him that it was not the sort of "stuff" he usually got, that he was waiting on his supplier to get him better crack cocaine, and that he hoped the price for the better cocaine would be lower.

After the transaction was complete, Greer returned to the DEA office and met with Sergeant Walls. He turned over the crack cocaine he had obtained and it was tagged as evidence.

At trial, the government played a recording of the transaction taken from Henderson's body wire. Henderson also identified a bag of crack cocaine introduced by the government as the drugs he obtained from Greer and Gibson on February 22. The parties stipulated that the bag had been tested by forensic chemists at the DEA laboratory in Dallas, Texas. They also stipulated that the test revealed that the bag contained crack cocaine and that no fingerprints were located on the bag.

### 2.

Henderson testified that the second deal was initiated by Gibson and Greer. Greer called him, asked where he was, and then showed up a few minutes later

with some heroin.  According to Greer, Gibson had instructed him to give Henderson a sample of the heroin to see what Henderson's "people" thought of its quality.  Greer gave Henderson a small sample, which he promptly turned over to Sergeant Walls and the DEA.  The parties stipulated that the sample was tested by a forensic chemist at the DEA laboratory in Dallas and tested positive for heroin and several other substances.

### 3.

The final interaction occurred in May 2008.  By this point, Henderson had obtained Gibson's phone number so that he could deal with him directly.  As directed by the DEA, Henderson called Gibson on May 19 to set up another purchase of crack cocaine.  Henderson told Gibson he wanted to purchase another half big of the "brown stuff."  There is some dispute over the meaning of Gibson's response, during which he said: "no, no, no, no what are you talking about?"  The defense contends that Gibson was telling Henderson that he only dealt in heroin, not crack cocaine, and that he did not have any cocaine.  Henderson testified that Gibson was confused and thought Henderson was trying to buy heroin when Henderson was really trying to buy crack cocaine.  In any event, the call dropped after Henderson tried to clarify that he wanted to buy a half big of crack cocaine, and he thereafter was unable to get Gibson back on the line.

Henderson tried again on May 21.  This time Gibson said that, even though he was focused primarily on selling heroin at that time, he had given some crack cocaine to one of his associates to sell.  Gibson said he could get the cocaine from that associate and sell it to Henderson for $1750.  Henderson testified that he and Gibson were trying to arrange the deal for the following day.

Before Henderson could contact Gibson again, Gibson called him while he was at the DEA offices.  Gibson asked if Henderson still wanted to go forward with the deal from the day before.  Henderson said he did and asked if the deal was a sure thing.  Gibson responded:  "Yeah, ain't no ifs, ands, or buts."  At the DEA's urging, Henderson asked if they could add a gram of heroin to the deal.  Gibson agreed.  They discussed the quantity, quality, and price of the heroin.  Henderson then turned the conversation back to crack cocaine and tried to haggle with Gibson over the price.  Gibson refused to budge from his original quote of $1,750.  They agreed to conduct the exchange at Henderson's house and Gibson said he would call when he was ready.  The government introduced a recording of this call as its Exhibit 9.

The DEA once again equipped Henderson with a body wire and he proceeded to the meeting place with several agents covertly following him.  They waited for a long time.  Then Greer appeared and, according to Henderson, explained that Gibson had called him.  Gibson apparently saw police in the area

and wanted to move the site of the deal.  Henderson and Greer drove to a nearby restaurant on Gibson's instructions.  But Gibson still wasn't happy and asked to move the deal again, this time to his own home.  At that point, Sergeant Walls told Henderson to back out of the deal, which Henderson did.

## B.

Gibson and Greer were indicted for conspiracy to possess with the intent to distribute crack cocaine, distribution of crack cocaine, and attempted distribution of crack cocaine.  Gibson's jury trial was held in October 2012.

In addition to Henderson, Sergeant Walls testified at Gibson's trial and explained how the DEA works with informants to conduct sting operations.  He also described his interactions with Henderson from late 2007 through May 2008.  His description matched Henderson's account.  Greer, who had already pleaded guilty and agreed to cooperate with the government, also testified against Gibson.  His account of the events leading to his and Gibson's arrest largely matched Henderson's testimony.  Two other witnesses' testimony established that the vehicle used by Gibson and Greer in February belonged to Gibson's sister.

The jury convicted Gibson on all three counts.  This is his appeal.

## II.

We turn first to Gibson's contention that he was improperly excluded from voir dire.  It is Gibson's "burden . . . to show he was absent during the [voir dire]

7

before he [can] have even an arguable complaint" about his exclusion. United States v. Bokine, 523 F.2d 767, 769 (5th Cir. 1975). He has not carried that burden. The transcript of voir dire reveals only that the district court took a recess towards the end of the process to allow the parties to decide how they wanted to exercise their peremptory strikes. Gibson points out that the record does not indicate that he was in the courtroom when proceedings resumed. But the record doesn't indicate that Gibson was not in the courtroom during the recess either. And Gibson points to no other evidence in the record to show that he was excluded. He only makes a bald assertion in his initial brief to this court that removal of the defendant from the courtroom during a recess is "standard." We do not presume error from a silent record. See id.[1]

## III.

We turn next to the evidentiary issues. Gibson contends that the government did not properly authenticate the audio tapes that were admitted at his trial. He also contends that the district court erred when it admitted, under Federal Rule of Evidence 404(b), evidence that Gibson provided Henderson with a sample of heroin and discussed selling heroin. See supra Sections I.A.2–3. We disagree.

## A.

---

[1] In his reply brief, Gibson asks that — if we conclude the record is not sufficient to demonstrate that he was excluded from voir dire — we remand the case to the district court for an evidentiary hearing on the matter. We deny this request. Gibson made no effort in the district court to raise this issue or to present any additional evidence regarding his exclusion.

Gibson did not object before the district court to the admission of the government's audio tapes. As a result, we review the district court's decision to admit those tapes only for plain error. United States v. Deverso, 518 F.3d 1250, 1254 (11th Cir. 2008). Gibson must show that "(1) an error occurred, (2) the error was plain, and (3) the error affected [his] substantial rights." United States v. DiFalco, 837 F.3d 1207, 1220 (11th Cir. 2016). Even if those conditions are met, we can review the forfeited error "only if (4) the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id. at 1221.

"An error is plain where it is clear or obvious." Id. "For the admission of evidence to constitute plain error, the evidence must have been so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, sua sponte, should have excluded the evidence." United States v. Williams, 527 F.3d 1235, 1247 (11th Cir. 2008). In this case, Gibson has failed to demonstrate any error occurred, let alone one that is plain.

Evidence is properly authenticated when the proponent of that evidence produces "sufficient evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Sergeant Walls explained how the recordings of the phone calls were made (i.e., by an earpiece attached to a cell phone that recorded both sides of the conversation) and attested to the accuracy of some of the recordings admitted by the government. Henderson also testified that

9

all of the recordings, except Exhibit 9, were accurate.[2]  He wasn't specifically asked about that exhibit's accuracy, but he did testify that he signed Exhibit 9 after listening to it.  The only logical reason to sign the disc containing the recording would have been to attest to its accuracy.  Moreover, Henderson and Greer listened to the recordings in open court, explained their contents, and never once contested their accuracy.

As to the identification of the voices on the tapes, a witness' opinion identifying a speaker's voice is sufficient to authenticate evidence so long as the opinion is "based on hearing the voice at any time under circumstances that connect it with the alleged speaker."  Fed. R. Evid. 901(b)(5).  Both Henderson and Greer identified the voices on the recordings presented by the government and testified that they knew Gibson personally.

All of this testimony, taken together, is enough to allow a finder of fact to conclude that the recordings were what the government claimed them to be.  As a result, the district court did not plainly err by admitting them.

---

[2] In his briefs, Gibson characterizes the government's failure to ask Henderson whether Exhibit 9 was accurate as "conspicuous," implying that the government did not ask because it did not want to know what the witness' answer would have been.  If this failure was so conspicuous, one wonders why there was no objection at trial.  It is just as likely that the government's failure to ask resulted from inadvertence.  We will not assume — especially on plain error review — that there was any improper motive on the government's part in failing to ask Walls or Henderson about the accuracy of Exhibit 9.

B.

Because Gibson preserved his objection to the admission under Rule 404(b) of evidence showing that he provided Henderson with a sample of heroin and discussed selling heroin to Henderson, we review the district court's decision to admit that evidence for an abuse of discretion.[3]  Deverso, 518 F.3d at 1254.  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co., 828 F.3d 1331, 1333 (11th Cir. 2016) (quotation marks omitted).  We find no abuse of discretion here.[4]

1.

Gibson contends that the district court's decision to admit the heroin evidence violated Rule 404(b) of the Federal Rules of Evidence.  That Rule provides: "Evidence of a crime, wrong, or other act is not admissible to prove a

---

[3] The government presented other evidence under Rule 404(b) as well.  For instance, it introduced evidence of Gibson's prior conviction for conspiracy to possess with intent to distribute cocaine and background information about his relationship with Greer, which involved drug-dealing and usage.  Gibson's appellate briefs focus only on the introduction of evidence concerning his involvement with heroin.  As a result, he has abandoned any argument about other forms of Rule 404(b) evidence introduced at trial.  United States v. Willis, 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate . . . .  Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument.") (quotation marks omitted).

[4] Because we conclude that the heroin evidence was admissible under Rule 404(b), we do not address the government's argument that it was also admissible as substantive evidence under the res gestae doctrine.

11

person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). In other words, the government may not introduce evidence that a defendant sold drugs in the past in order to prove that he probably sold drugs in the present. Nor can the government argue that, because a defendant sold one type of drug, he probably sold a different type of drug as well.

But evidence of prior bad acts is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We have previously held that prosecutors can demonstrate a defendant's intent to distribute drugs in the present by demonstrating that the defendant distributed drugs in the past — even if the past distribution involved a different type of drug. United States v. Diaz-Lizaraza, 981 F.2d 1216, 1224 (11th Cir. 1993) ("[E]vidence of prior drug dealings . . . is highly probative of intent in later charges of conspiracy and distribution of a controlled substance."); United States v. Williford, 764 F.2d 1493, 1498 (11th Cir. 1985) ("When intent is at issue, however, extrinsic evidence [of dealing in other types of drugs] is admissible to show willingness to deal in drugs.").[5]

---

[5] Our decision in United States v. Young, 39 F.3d 1561 (11th Cir. 1994) is not to the contrary. In that case, the government used evidence of a defendant's prior involvement with the production of alcohol at an illegal still as extrinsic evidence of intent in a marijuana prosecution. Id. at 1572–73. We explained that this was improper under Rule 404(b) because "[a]lcohol is not a controlled substance, and the illegality of its production is distinct in both fact and law from that involved in growing and selling marijuana." Id. at 1573. Cocaine and heroin are both

12

That is exactly what the government did here: it used the fact that Gibson provided a sample of heroin to Henderson and discussed selling heroin to him as evidence of his intent to distribute narcotics, including crack cocaine. Although Gibson appears to ask us to reconsider our holdings in Diaz-Lizaraza and Williford, we are bound by the decisions of prior panels of this Court. United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.").

Gibson also argues that it was improper to admit the heroin evidence to prove intent in his case because his intent was not at issue. But his not guilty plea put the burden on the government to prove his intent to distribute crack cocaine beyond any reasonable doubt. United States v. Barron-Soto, 820 F.3d 409, 417 (11th Cir. 2016). Absent a stipulation from Gibson, the government was required to present evidence of intent and was free to use whatever relevant evidence was available to it, including evidence of prior drug dealings. Diaz-Lizaraza, 981 F.2d at 1224–25 ("[T]he government may introduce evidence of the defendant's extrinsic acts to prove intent if the defendant does not affirmatively take the

---

controlled substances. And while the means by which they are produced may differ greatly, the manner by which they are distributed does not. Moreover, Gibson is not accused of producing the drugs he sold.

13

question of intent out of contention by stipulating . . . [to] the requisite intent." (quotation marks omitted) (second alteration in original)).

2.

We also reject Gibson's argument in the alternative that the heroin evidence should have been excluded under Rule 403 because it was unduly prejudicial and confusing. "Under Rule 403, the district court may exclude relevant evidence if its probative value is 'substantially outweighed' by a danger of unfair prejudice, confusing the issues, or misleading the jury." Barron-Soto, 820 F.3d at 417. "Rule 403 is an extraordinary remedy" that should be "invoked sparingly." United States v. Lopez, 649 F.3d 1222, 1247 (11th Cir. 2011) (quotation marks omitted). It "requires a court to look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id.

"Evidence of prior drug dealings is highly probative of intent to distribute a controlled substance," even where the prior dealings involved "a smaller amount and different type of drugs." Barron-Soto, 820 F.3d at 417. That Gibson's counsel admitted that Gibson had entered into an agreement to sell heroin and all but admitted that he was a heroin dealer does not negate the probative value of the heroin evidence in this case. Counsel's statements are not evidence. United States v. Smith, 918 F.2d 1551, 1561 (11th Cir. 1990). No matter what Gibson's counsel said, the government bore the burden of introducing actual evidence of Gibson's

14

intent.  It was permissible to use Gibson's past involvement in drug trafficking as part of that effort.

Nor is this a case where the government's other evidence of intent was so strong that there was no need for the heroin evidence.  See United States v. Costa, 947 F.2d 919, 926 (11th Cir. 1991) ("[I]f the government's case [on intent] is strong, there is no need for [extrinsic] evidence.").  Nearly all of the government's evidence in this case — including the evidence of the heroin transactions — came from witnesses who had themselves committed crimes.  Both Henderson and Greer are drug dealers themselves and had cooperation agreements with the government.  And the other evidence in the case — i.e., the crack cocaine, the heroin, and the audio tapes — was connected to Gibson primarily through their testimony.

Moreover, we cannot see how Gibson was unfairly prejudiced by the admission of the heroin evidence here, given that part of his defense was that he was a heroin dealer, not a cocaine dealer.  Nor are we persuaded that the jury would have been confused by the admission of the heroin evidence.  The district court specifically instructed the jury to consider the heroin evidence only for the purposes of determining Gibson's intent.  And we presume jurors follow their instructions.  Jamerson v. Sec'y for the Dep't of Corr., 410 F.3d 682, 690 (11th Cir. 2005).

15

IV.

Gibson also contends that the evidence introduced against him was not sufficient to support his conviction for attempted distribution of crack cocaine. "We review . . . a challenge to the sufficiency of the evidence . . . de novo." United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). "In so doing, [we view] the evidence in the light most favorable to the Government and resolve[ ] all reasonable inferences and credibility evaluations in favor of the verdict." United States v. Isnadin, 742 F.3d 1278, 1303 (11th Cir. 2014). "We must affirm [Gibson's] convictions unless, under no reasonable construction of the evidence, could the jury have found the [him] guilty beyond a reasonable doubt." See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

To sustain a conviction for attempted distribution of crack cocaine, the government must prove (1) that the defendant acted with the specific intent to distribute crack cocaine, and (2) that he took a substantial step towards committing that offense. See United States v. Collins, 779 F.2d 1520, 1530 (11th Cir. 1986). "[A] substantial step must be more than remote preparation, and must be strongly corroborative of the firmness of the defendant's criminal intent." United States v. Blalinger, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (quotation marks omitted).

Gibson's attempt conviction is based on the aborted crack cocaine deal that occurred on May 22, 2008. See supra Section I.A.3. Gibson contends that the

16

government has failed to show that he took a substantial step towards distributing crack cocaine on that date, because it has not shown anything other than remote preparation. At most, he argues, the government has shown that he talked about selling crack cocaine. We disagree.

The government's evidence was sufficient to show that Gibson reached a firm agreement with Henderson as to the date and location of the transaction as well as the price of the drugs. It also showed that he dispatched an accomplice — Greer — to the location at the appointed time to talk to Henderson on his behalf and change the location of the deal. That is more than enough to establish a "substantial step" towards the distribution of crack cocaine. See United States v. Brown, 604 F.2d 347, 350 (5th Cir. 1979) (agreement for the acquisition of explosives and dispatching of representatives to reconnoiter and inspect the target location was sufficient to establish a substantial step towards blowing up a grocery store).

## V.

Gibson next contends that his convictions should be reversed because the prosecution shifted the burden of proof onto him during closing arguments. This is so, Gibson argues, because — during closing arguments — the prosecutors said that the defense did not challenge the prosecution's evidence that a voice in two of the recorded calls was Gibson's. Additionally, Gibson complains that the

17

prosecutors told the jury that they were not going to hear "an actual contesting of the facts" from defense counsel and that "the evidence is really unrefuted to you what happened in this case."

The parties disagree as to the proper standard of review on this issue. The government argues that we should apply the plain error standard, because Gibson failed to object in the district court to the prosecutors' arguments. Gibson argues that he did object to the prosecutors' arguments in the district court, pointing to the following statement from the defense's closing argument:

> Another thing I wanted you to be worried about and want you to really focus on [is] if it gets said that the defense wants you to believe something, wanting [sic] you to see something – not being disrespectful. I don't have to present evidence for you to believe anything. That's not my job. I can sit there the whole time. I don't have to prove anything in this case. That's called shifting the burden of proof if your case falls apart, put it on the defense that they didn't prove their case.

"To preserve an issue for appeal one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought. The objection must be raised in such clear and simple language that the trial court may not misunderstand it." United States v. Straub, 508 F.3d 1003, 1011 (11th Cir. 2007) (quotation marks and citations omitted). Defense counsel's statements to the jury during his closing argument in this case do not satisfy this standard. They are general instead of

18

specific, come in the middle of a closing argument, and are directed at the jury instead of the judge.  As a result, the plain error standard applies.

Even if we assumed that the prosecutors' statements in this case were plainly improper, Gibson has not shown that they affected his substantial rights.  While "a comment that is so prejudicial as to shift the burden of proof sometimes requires reversal[,] . . . any potential prejudice can be cured by an appropriate instruction." United States v. Zitron, 810 F.3d 1253, 1259 (11th Cir. 2016); see also United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) ("This court has held that the prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof.").  Here, the district court informed the jury that "[t]he law does not require a defendant to prove innocence or to produce any evidence at all," that "[t]he government has the burden of proving the defendant guilty beyond a reasonable doubt," and that [i]f it fails to do so, you must find the defendant not guilty."  As we have already observed, we presume that the jury heard and obeyed the instructions. Jamerson, 410 F.3d at 690.

Because Gibson has failed to demonstrate any effect on his substantial rights, he cannot prevail on this issue.

19

VI.

Finally, Gibson notes that, after he filed his notice of appeal, he filed a motion for a new trial in the district court alleging that the government failed to disclose impeachment evidence about Henderson. He raises that argument again here and requests a remand to the district court for an evidentiary hearing.

When a motion for a new trial is filed with the district court after a notice of appeal has already been filed, the district court may either deny the motion or notify this Court of its inclination to grant the motion, in which case we would consider remanding the case. United States v. Khoury, 901 F.2d 975, 976 n.3 (11th Cir. 1990). But the district court has not done either in this case. So, even though a notice of appeal can extend to orders resolving post-conviction motions for a new trial filed after an appeal is taken, United States v. Brester, 786 F.3d 1335, 1338–39 (11th Cir. 2015), there is no order — let alone a final appealable order — for us to review as far as Gibson's motion for a new trial is concerned, see 28 U.S.C. § 1291. Moreover, the district court has not indicated that it is inclined to grant his motion for a new trial or that the motion raises a substantial issue. See Fed. R. App. P. 12.1. For those reasons, to the extent Gibson's appeal concerns his motion for a new trial, we must dismiss it for lack of jurisdiction.

20

## VII.

Gibson's contentions concerning his alleged exclusion from voir dire, the trial court's evidentiary rulings, the sufficiency of the evidence against him, and the prosecutors' closing arguments are without merit.  As a result, we affirm the district court's judgment of conviction.  Because the district court has not yet resolved Gibson's motion for a new trial in the first instance, we dismiss for lack of jurisdiction the portion of his appeal concerning that motion.

**AFFIRMED IN PART, DISMISSED IN PART.**